Good morning, your honors. My name is Kevin McCoy. I'm with the Federal Defender's Office and I'm here to represent Mr. Maness. With the court's permission, I'd like to focus my comments first briefly on the shackling issue and then secondly on the sentencing issues that are presented and discussed in the letter briefs. With regard to the shackling, it's our view that that's a violation of Mr. Maness' rights to due process. There was no notice that this was given. Let's assume it is. What's the prejudice? It looked to me as though the evidence was – as though there was not a very well-developed basis for the shackling. Not at all, yes. I agree. That's what the marshals recommended and that was that. On the prejudice, it looked as though the judge was very careful to make sure that no jurors saw it. One juror walked back there to get his jacket and the judge noted on the record that that person never looked toward where he could see the shackles. I can't point to anything in the record that would suggest to you that a juror knew about this and that's clear. Why doesn't that eliminate the issue? Because I think the question really has to resolve on what's the impact on Mr. Maness. It's a twofold – You thought the only issue on shackling was the impact on the jury. I disagree, Judge. I think you have to show the impact on the defendant and his ability to participate in his defense, his ability to communicate with counsel, and his ability to actively – Okay, great. If he couldn't talk to his lawyer, that would be a due process issue or a Sixth Amendment issue. Right. But what's the evidence that there was any difficulty caused by the shackling with communicating with counsel? There's no evidence because there's never been a record developed about it, and that's why I submit that you have to remand the matter for that record. I think if you look at the case law, the Ninth Circuit case law dealing with shackling, you do look at the prejudice as you've done right at the get-go, and I can't point to prejudice, but then you have to look at what the impact on this was of Mr. Maness. I think it's important to remember that this was a decision that was made ex parte without participation by Mr. Maness. We were caught flat-footed at the beginning of the trial, and that decision was made at the outset, and so we were laboring under that as the trial developed. I can't point to anything in the record that suggests that there was problems with communication. I can tell you that Judge Beislein said, okay, take the shackles off when he's testifying. I want the man to be able to walk up and walk back so the jury thinks he's free. His testimony continued over the lunch break, and the shackles were put back on him, and we had to reapply to Judge Beislein to have them removed. So I can't articulate what the problems are, but I think the case requires a remand to address those problems, so Mr. Maness can have his opportunity to stay in court. Why shouldn't it have been raised during the trial? Judge, I'm having trouble communicating with my client or this or that in a conference at the bench. If I had had information like that, I would have presented it to him. But there are cases in this circuit where there was nothing discussed at the trial court. The person didn't complain of pain, didn't complain of difficulties communicating, and yet in a state habeas, using that standard, was remanded for an evidentiary hearing to establish what, if any, problems the defendant had. The complaints were made in post-conviction relief that I had problems communicating or the shackles pained me or things of that sort. I think the law requires a remand so that he can have his day in court. You're right. If I was aware of that, I would have been obligated to bring that up. And the case that I'm referring to, Judge, is cited in my brief. You should find it there. I can't think of the name of it. It's a recent habeas case that involved a stun belt where a person was forced to wear a stun belt. I remember this. That's the one I'm talking about. And in that case, that habeas case, a remand was required for the opportunity to develop the record. Okay. I think those are the things that I would discuss about shackling unless the Court has additional questions. I can tell you that Mann has complained to me about it, but I don't think I can point to any place in the record where I can say that there are problems. That's why I'm asking for the remand. What I'd like to do next with the Court's leave is to move on to the sentencing issues that are evident here. Our view is that there are sort of the sentencing questions in this appeal have two very broad aspects. The first aspect that I'd like to discuss is what proof was there, if there was any proof that the Norenko was a prohibited weapon that required the increase from 14 to 20, base offense level 14 to base offense level 20. And then secondly, I'd like to discuss sort of the impact Blakely would have on the prohibited weapon issue and on the other sentencing enhancements that are discussed. The statute 921A30 defines semi-assault weapons for purposes of the Felon in Possession Statute, and in part it says one of the prohibited semi-assault weapons is the Norenko automav Kalashnikov. The record in this case clearly establishes that we're talking about a Norenko weapon, but there was no evidence that was presented in any format that described this as a Norenko automav Kalashnikov. And there was no evidence presented that it had the other prohibited characteristics that semi-automatics have that are listed in that statute. There was testimony by the ATF expert that it had a folding stock and that it had a pistol grip, but there was no evidence describing it as conspicuous or anything like that. But my position is that just calling it a Norenko is not enough to establish that it was a prohibited weapon. And for that reason alone, the enhancement from level 14 to level 20 should be vacated. But even if you disagree with that argument or you somehow conclude that it does qualify as a prohibited semi-automatic assault weapon, our view is that it's otherwise excluded by or exempted under 922V3. That's the statute that the guidelines refer to that say, you know, the enhancement doesn't apply if it's excluded by 922V3. And 922V3 refers you to an appendix and says these are the list of weapons, and if it's in the list, then it doesn't apply. But that statute also says that it's not an exclusive list, and if there are other reasons why it might be excluded, then it should be excluded. And our view is that 922V is the assault weapon ban. That was where Congress banned assault weapons, and they gave precise definitions as to what the assault weapons were. And there's a grandfather provision that says weapons that were manufactured before September 13th, I think, 1994, that is not a prohibited assault weapon. And so for that reason, we think that the particular weapon here was exempted by 922V3. And I think if it makes sense, if you talk about felon and possession statutes, because it's whether it's a prohibited weapon, not just whether he's a prohibited person. And so I think the inquiry has to be, is it a prohibited weapon? And I don't think that inquiry was made in this case, and it's my view that it is exempted under 922V3. And then last but not least, probably in the calendar with the Blakely issue, I've listened to the arguments earlier today with regard to Blakely, and you can anticipate what my view is. Just very briefly, 18 of the 32 offense levels in this case were the result of post-verdict judicial findings, and we think that a remand is appropriate. I was listening to the arguments, and Judge Kleinfeld, your questions about Agostini, and I think that is a hard question, but I think my answer to that would be that the Apprendi and Blakely were clear Sixth Amendment cases, and as my colleague, Ms. Mendel, said, the court could not have been more clear when it discussed what the meaning of statutory max is and the prohibition against post-verdict judicial fact-finding. I know that that's inconsistent with, I think it's Watts and the other cases, but none of those cases are Sixth Amendment cases, and I would argue that. Are they just based on a construction of the guidelines? I think so, and they're based on, you know, before you had guideline sentencing, judges had wide-ranging discretion, and they had to find facts by a preponderance. That was imported into the guidelines, but then you had this construct that resulted, like you have here in some of the other cases you've seen today, where there's this sort of massive increases of sentences that weren't passed on by the jury, and I think that's what the Supreme Court's trying to get at, and so I think it's such a clear break from prior authority that I don't think Agostino is a problem, or that's my view, and that would be my answer to that particular question. The other example is the Almendorz-Torres example, where courts are still bound by that after apprending, but the thing about Almendorz-Torres was that it was a direct finding. The argument was present the prior conviction to the jury after apprending, but this court and other courts are bound, but hasn't the Supreme Court directly said, we do not have to present the prior conviction, so we won't do it unless they change their mind? This is different. This is a sea change, and it's a sea change in the Sixth Amendment area. When you look at those other cases, you're not going to see Sixth Amendment roots, and so that's the reason that I would argue that Agostino is not the problem. What you'd say then is follow Watts when Watts applies. Watts applies to a challenge that's similar to the one in Watts. Yes, sir. There's no Sixth Amendment challenge in Watts. Right, the court wasn't asked to pass on the Sixth Amendment challenge, and so that's my argument. With regards to the enhancements in this case, I would like to ask you to look at the standard of review. I think we did preserve the apprendee objection in front of Judge Weisslein with regard to the six-level enhancement from 14 to 20 based on the prohibited weapon issue. It's cited in the letter brief, and it's discussed where I pointed out apprendee, and said I think because there's a six-level bump and it's a particular weapon, the jury has to pass on that. But I also acknowledged, as I'm required to do, that controlling authority in the circuit is against me, and that was the Sheiwalder case. And, again, it's in the letter brief. So I basically preserved that issue. So at least with regards to the prohibited weapon aspect, I think you have to review it on a de novo basis. The other enhancements I did object to, but not on Sixth Amendment grounds, and so I think you apply the plain error test to those. And I think it qualifies, and the issue is whether you should exercise your discretion to step in. And I think when you have a situation, you know, the McMillan versus Pennsylvania discussion where the tail wags the dog, that's really what happened here, you know, in terms of you have a base offense level that exposes a man to 21 to 27 months, and he ends up with actually a guideline range that exceeds the statutory max, and then he gets the statutory max. His sentence was five times what his base offense level, in effect, was. And so that is the reason that it affects, in my opinion, the integrity and public reputation of the proceeding. Oh, another area that I should perhaps touch on is what's the appropriate remedy. There has been some discussion as to whether the guidelines should be declared unconstitutional or whether you should just remand. There's been two choices recognized in the four district court opinions that have come out. Judge Casella in Utah declared them unconstitutional. The other judge, I think from Virginia, in Shamblin, just applied Blakely to the guidelines. And our argument is that you don't declare them unconstitutional. Our argument is that, you know, you make every effort you can to hold a constitutional statute. I guess that's going to be a big issue. It is. It is the good part without the bad part. It is. And there's some dissatisfaction with that that Judge Casella talked about. I mean, it doesn't seem like that's fair to the government and, you know, this isn't what Congress intended. My answer is it calls for a legislative response. I mean, what Blakely has said is, look, you can have your sentencing schemes, but if you're going to, you know, increase with enhancements, you've got to run it by the jury. And so it really calls for a legislative response, and that's why I think a remand is appropriate. I have difficulty, but maybe this is a difficulty with Blakely rather than with your argument. I have a difficulty where a jury says the man is guilty of an offense with, let's say, a 20-year max. And the guideline says there's a 37-month max unless this and that and the other. We already have a jury determination for a 20-year max, but maybe that's just a difficulty with the guidelines rather than or with Blakely. Right. You know, I think the guidelines have the force of law. You know, they really are enacted by Congress. There's been several examples of the Congress stepping in with the Crack v. Powder Protect Act and the Feeney Amendment stepping in indirectly. So I think they're the ones that are setting the max. I mean, if you look at Blakely, you know, Washington had a maximum 10, but I think whatever they called preferred ranges, there was a range. But that was set by the legislature. And so, you know, in response to that concern, I guess I would say, yeah, but what Congress has done is they've endorsed these guidelines, and those are the statutory ranges. And so in that instance, the defendant who decides to take the gun, put it in his pocket when he's not supposed to. He's looking at 21 to 27. You know, it clearly is a sea change. But in terms of whether the result is unfair if you just remand it, I think that's, you know, I suppose we all have sources of information. You know, this is outside the record, but I think Congress is going to move in. I've heard that there are going to be hearings as early as July 13th to at least come up with a legislative response. So those are the thoughts that I would offer. I would welcome any questions or save the balance of my time for rebuttal. Thank you. Thank you. Thank you. May it please the Court, Counsel. My name is James Gakey, and I represent the United States. I'll respond first to the Blakeley issue raised by Counsel. I believe the Blakeley issue has been well argued by Ms. Heller and Ms. Loeffler, and I think that Judge Kleinfeld has the issue squarely on point. The Blakeley issue simply is not before the Court today. There are a number of Supreme Court cases as well as non-secure cases that have upheld the guidelines, the constitutionality of the guidelines. They are not, at this point, unconstitutional. And the only Supreme Court guidance we have is instructions that the guidelines were not before the Court in Blakeley. So I don't think we need to get to the Blakeley issue today. And if we were to get to the Blakeley issue and think in terms of what to do if Blakeley were to apply, I think the only thing that can be done is that the guidelines would have to be considered unconstitutional in total. You cannot have your cake and eat it, so to speak. The guidelines are a comprehensive system that were designed to encompass upward departures, downward departures, upward adjustments, downward adjustments. And if the guidelines apply only to go down, that's clearly not the system that the Commission or Congress intended. As to the Shackley issue, I think also the issue there is prejudice. There is no prejudice in the record whatsoever. Are you conceding that there was not an adequate record to justify the shackling? I'm not. I'm not. I'll address that first. I believe there is clearly an adequate record to justify the shackling. The district court in this case. Sorry, I missed some words in what you just said. I believe there was an adequate record to justify the shackling. The district court in this case, in an exercise of the district court's discretion, considered the marshal's opinion that for courtroom security the defendant would have to be shackled. Actually, he made a very odd statement. He said, the marshal doesn't tell me what to do, and I don't tell the marshal what to do. And the marshal says he needs to be shackled, so he's going to be shackled. I mean, to me that's a very troubling way to approach this issue of shackling. And if that's the only statement we have from the court on the issue, the issue might be different. But on the second day of trial, the court came back to the issue and said, I've considered the case, I've considered this defendant, I've considered the charges against this defendant, I've considered this defendant's past history. And we have a case where the defendant has made numerous allegations of death against law enforcement officers. It is a... What page are we looking at? I missed this. We're looking to the second day of trial, volume three, excerpt of record, tab R, pages 2-2 through 2-4. The court made it clear that he considered Manus' potential to be disruptive, allegations of violent threats against law enforcement. And he also made it clear... The court took very clear steps to make sure that he employed the least restrictive alternative available. That's true. I'm just trying to see where he gave other reasons. I think I don't have... Why don't you tell me the transcript, the excerpt pages? It's again, it's volume three of the excerpt of record, tab R, pages 2-2 through 2-4. And this case is different from the case at counsel sites where an individual had a shock belt on his person that was interfering with his ability. There was post-judgment information in the record that said that that caused him pain and it influenced his ability to communicate with counsel. There's nothing in this record that says it influenced him. I think counsel conceded that. Yeah, exactly. And that's why this case is different than the case where... Right. It's still troubling about the record, but if there's no prejudice, and they did use the least restrictive means. Exactly. And I think that's the controlling issue here. We don't get to harmless error because there was no prejudice. The court was very careful to ensure that he came down into the well to make sure that the jurors could not see the shackles. When there was an incident where a juror could have possibly theoretically seen the shackles, the court was careful to focus on that juror, ask counsel if he wanted an opportunity to voir dire that juror, that opportunity was declined. So the shackling issue, I believe, is a non-issue, and there's no evidence whatsoever that it impacted Mr. Mattis' ability to communicate with counsel or to present his defense. He was allowed to walk. The court took the also additional step of allowing Mr. Mattis to walk to the witness stand unshackled, to allow him to appear and voir dire unshackled. There wasn't an issue that marshals put him back at the break when the jury was not present, back on the witness stand in shackles. That was addressed immediately, and the shackles were removed. But to accommodate that, it's not as though part of the trial he's not in shackles, part he is. When he was not in shackles, there was additional courtroom security in the court. Additional U.S. marshals were present. So it's clear that the court perceives this defendant to be a risk to courtroom security. And on the assault weapons issue, the assault weapons enhancement, there is, as counsel acknowledges, there is evidence in the record that this is an assault weapon that meets the definition of assault weapon in the statute under 18.921.A.30. There's evidence from an ATF expert that says this weapon has a pistol grip, this weapon has a folding stock. What do you do about the pre-'94 manufacturer? That's a non-issue. He was not charged with the violation of 922.V.1, which makes it illegal to have an assault weapon, regardless if you're a prohibited person or not. And moreover, this weapon, while there was evidence in the record that it was made pre-ban, the guideline enhancement, 2K2.1.A.4, the application note that references 922.V.3 does not reference 922.V.2. 922.V.2 is the exclusion for weapons made prior to the ban. That's the only place that this weapon would be excluded, and that is only for someone who is charged under 922.V.1 as a person, any person, who has a prohibited assault weapon. And the congressional intent behind that should be relatively clear. Mr. Mattis is a prohibited person. He can't have any weapons, any pistols, any rifles, much less an assault rifle. So he has opened himself up to an enhancement for the particular type of weapon he had. And it's clear in the record the type of weapon Mr. Mattis viewed this to be. He says in the record he chose this weapon when he exited the RV and ran from law enforcement into the woods. He says he chose the Narenko because it was the, quote, best fighting weapon. So it's clear why the enhancement should apply in this case. And the application note does not anywhere reference 922.V.1 or 922.V.2. Rather, the application or the guideline itself represents 921.A.30. I'm sorry, 921.A.30 provides definitions of assault weapons. While it does call out the Narenko and several other manufacturers, Narenko, Avamat, Kalashnikov, and other weapons by name, it also provides generic measures that the court can decide if the weapon is an assault rifle. Those generic measures are folding stock, a pistol grip, bayonet mount, flash suppressor, and grenade launcher. In this case, there is evidence in the record that this weapon has a folding stock and a pistol grip. While the officer did not specifically say it protrudes conspicuously below the weapon, the court is free to look at the weapon itself. It's clear. The record is rife with testimony that it is an AK-47. The pistol grip protrudes very significantly below the weapon. The officer testified that he could shoot this weapon one-handed. And moreover, the issue that Mr. Maness raised pro se, and counsel may mention in rebuttal, a Jameson case out of 11th Circuit. In Jameson, that is an entirely opposite case. In that case, the ATF expert on the stand conceded that the weapon in that case, while a Narenko, did not have two of the factors that make it an assault weapon. Did not have two of the other required factors, such as a folding stock, grenade launcher, that sort of thing. And moreover, it was clear that the government was relying only on the earlier provision of 922A30 that it was a Narenko. That's not the provision that the government is relying on here, or the court did to establish that this weapon was an assault rifle. I'd like briefly to address some of the other issues that were raised in the briefing. The only other two points raised was Mr. Maness wanted to present evidence. Let me back up to one thing on the shackling. Has there been some opportunity so that if the shackling did interfere with communication between the defendant and his attorney, that a record could have been created? Counsel took every opportunity to create a record when necessary. For instance, when Mr. Maness was placed on the stand in the middle of his testimony after the lunch break and shackled, counsel raised that with the court and it was addressed immediately. It seems to me, had there been, Mr. Maness was not one who was shy of complaining about the injustices done to him. He took the stand and complained ad nauseum about the injustices done to him. If he had had a problem, if he had felt there was pain in those shackles, he would have said something. And I believe he had able counsel, Mr. McCoy would have raised it with the court immediately. Even today, Mr. Maness, there's nothing in the record, nothing post-conviction where Mr. Maness has raised this issue. He didn't like the shackles, sure. He didn't like any restraint in his liberty. He doesn't think he should be in jail today. But that doesn't mean it interfered with his ability to participate in trial or communicate with counsel. The other two issues raised in counsel's brief were Mr. Maness wanted to present evidence at trial that he had been shot in the back. First, the government would posit and was prepared to present at trial evidence that this, in fact, was not the case. He was actually shot in the shoulder and that the exit wound just happened to be smaller than the injury, which is the reverse of the usual case. And it's clear from Mr. That evidence is excluded by the trial court as wholly irrelevant. And that is an appropriate ruling because it was clear from Mr. Maness' own testimony that he possessed the assault weapon. In fact, he'd said earlier he'd chosen that because it was the best fighting weapon. So the issue of whether he was shot in the back or not has nothing to do with whether he was a felon, a prohibited person in possession of ammunition or firearms. Moreover, he was allowed to present and tell his story. Basically, everything but saying I was shot in the back. He was allowed to talk about how the officers approached him, where he said he was. The officer was looking how he said he was facing the officer. Then he said he did not have his gun pointed at the officer. So he was allowed to present essentially all of that evidence anyway. The other issue is the justification defense. A counsel opposed to present instructions on duress and justification. It's really boils down to an issue about justification, duress and justification. We have the same elements. The defendant would have had the shown that the evidence he had to meet four elements to present justification defense. He did not meet any one of those elements. And he would have had to meet all four of those elements. Specifically, he would have had to show that there was no evidence that he was under a lawful threat of death or serious bodily injury. The record is replete with from the immediate time, from the first time law enforcement contacted Mr. Maness, they identified themselves as law enforcement. Mr. Maness responded to them with death threats, responded that he did not want to go back to jail, though on his direct testimony, it was clear he used a different term to refer to jail. But it was clear that he, by reference to the jail, knew they were law enforcement. And then when he led them on a 15-mile chase with a chain of police cars, the sirens and lights blaring, he should have had a good idea they were police officers. When he exited, when his vehicle finally came to a stop and he ran into the woods and there were helicopters and dogs and bullhorns, he should have had a good idea they were officers. When he turned and raised the weapon to shoot at two uniformed state troopers with a dog, he should have known they were officers. So he doesn't meet the first element. Another element is the appellant could not have recklessly created the situation. Plainly, his flight from a caravan of law enforcement officers created that situation. He had every opportunity to surrender. There was a tape recording of the initial contact with Mr. Maness at his property that clearly demonstrated the troopers were very diligent in trying to coax him out of the motorhome to avoid a confrontation. Mr. Maness refused every opportunity to respond with profanity and threats of death. Another element is the appellant had to have had – if he had legal alternatives, he was not entitled to justification defense. He plainly had a number of legal alternatives. He could have stepped out of the woods. He could have stepped out of the motorhome. He could have surrendered numerous times. He chose not to. And the threatened – another element is the threatened harm could not have been caused by the defendant. The harm here, his fear that he was going to be shot by law enforcement officers, was plainly caused by his decision to grab a weapon and tell officers he was going to kill him. So in short, justification and duress were not appropriate instructions. And again, back to the facts of the case a little bit, that goes back to why the firearms assault enhancement is so important in this case. This is an extraordinary situation where you have an individual who is a felon, who is a prohibited person, who refuses to recognize any lawful order ever put to him, chooses to arm himself with a bolt-action rifle and a pistol as well as an assault rifle. This is exactly the type of person who is entitled to an enhancement. And the record also demonstrates that the court was very willing to consider upward departures. It did not because it didn't need to. The guideline range was so far above the statutory maximum that the court did not need to. Another issue that was raised by Mr. Maness in recent pro se filings, I'm not sure if the court has seen that or has considered it, that came in recently. I do want you to know, nothing is waived by not being discussed in oral arguments. Exactly. I read the briefs. I'd like to say Mr. Maness raised an obstruction issue, kind of along a Blakely issue, that the obstruction of adjustment enhancement shouldn't have applied to him. And he cited a couple of cases that affect it. I believe those are inopposite. In this case, in U.S. v. Inez, the Ninth Circuit made clear that if, to support enhancement for obstruction of justice under Section Guidelines 3C1.1, it is sufficient for the court to make a finding that encompasses all of the factual predicates for a finding of perjury. Not to specifically enumerate the elements, but if the elements are essentially discussed, it's sufficient. In this case, they were. That appears at tab U in the excerpts of record at page 21. And the court found that the defendant gave false testimony under oath that concerned a material matter, and there was a willful intent to provide false testimony. The court plainly rejected all of Mr. Maness's testimony. While the court did not use the word material, it is plain that all of Mr. Maness's testimony was material to the issue of his guilt. And he essentially denied it. Thank you, counsel. Thank you. I just want to make three brief points with regard to the shackling. The opportunity to make a record. I think you should recognize that Mr. Maness and I were caught flat-footed. We had no notice of this at all. This is a difficult trial with a lot of issues going on. It's not until after the trial that you realize some of the impacts that things are happening. It's clear under the case that I cited, Judges Dias versus Poole, it's in my reply brief that talks about the appropriateness of remanding a case to develop the record, and I think that that should happen here. Mr. Maness was shackled because people didn't like him. He wasn't shackled because he presented any danger to the court. There's certainly no record, and all you have to do is look at what happened. Judge Beisling decided to defer to the marshals. That's fine if the marshals have facts, like they did in the Collins, but they didn't have any facts. With regard to the assault weapon. Well, we have some facts. This was quite a desperado there somewhere around Wasilla. Yes, it was. Yes, but in the briefs as well, merely because you're charged with an offense, that alone is not enough. There has to be, and you know this, there has to be some record. Sure, maybe he'd behave in court even though he didn't behave out there. And, in fact, that's what the record describes. I've asked you to take judicial notice of the state court trials. He had one in 98, and I think two immediately before this trial, and he was never shackled. And if you care to review the state court file, you're going to find no shackling order in there. He was also not shackled during Voydier and didn't create any problems. He didn't create any problem then at all. And he was shackled because people didn't like him, not because there was any threat. And this court has used the word odious when you talk about shackling, and that's right. And I think it's important to remind the district court that they should be more careful about these orders because it has an impact on the trial. You're asking me can I point to anything in the record, and I'm truthful, I can't. But, you know, it has an impact on a human being. It's undignified. I'm trying to think of what the impact is. I mean, obviously people don't like it. And obviously as a prophylactic measure against all the impacts it could have, we're quite restrictive in when we allow it. But I'm trying to think what impact it would have. One is the jury, and they didn't see it. And the other is on communication. And really what used to interfere with my communication with clients the most was before the trial when I couldn't find them. Right. I guess, you know, how does it interfere with communication? People become agitated. People become less communicative. People become distracted. You know, those are the kinds of things that when you're shackled, you know, you can't move around a lot. You know, your freedom of movement is restricted. Who knows? I can't point. If I could point to something in record, I would. I'd say the jury saw this, but I don't think so. But I don't know how it impacted Mr. Manis. I know that it affected him. He complained about it. The marshals unilaterally put him back up on the stand in the middle of his testimony over the lunch break in the shackles. Now, of course, Judge Beisling responded as he should have. The point is, is the dignity that's associated with that and the impact that would have on somebody. So that's my answer to the question. With regard to the semi-automatic weapon arguments that counsel has made, if you just wanted to prohibit people from having semi-automatic weapons if they're felons, you would just say so. There would be no reason to reference to an exception. And here the exception, if you look at the assault weapon ban, it was hotly contested in Congress. It's for a 10-year period. It has a sunset clause. And they did exempt weapons manufactured before that date from the ban. And there's the two out-of-circuit cases that I have cited that have, applying to an analogous guideline provision, have held that the grandfather clause prohibits those weapons from being used. So those are the thoughts I would offer. Unless you have questions, thank you for your courtesy. Thank you, counsel. The latest statement is that Moness is submitted. And you're adjourned. All rise. This court for this session stands adjourned.
judges: Hall, Kleinfeld, Wardlaw